UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STEVE COBURN,

   Plaintiff,

  v.           No. 09-728 JCH/ACT

REGENTS OF THE UNIVERSITY
OF CALIFORNIA d/b/a LOS ALAMOS
NATIONAL LABORATORY;
Butler International, Inc., a Maryland corporation;
JOHN DOE, employee of Los Alamos
National Laboratory; ROBERT FARRIS, in
his official and individual capacities;
Glen Trehern, in his official and
individual capacities; WILLIAM
GORMAN, in his official and individual
capacities; and BEVERLY RAMSEY, in her
official and individual capacities,

   Defendants.

**MEMORANDUM OPINION AND ORDER**

   This matter comes before the Court on *Defendants' Motion for Summary Judgment* (Doc.

24).  Plaintiff Steven Coburn, a former facility operator with Los Alamos National Labs'

("LANL'S") Fire Protection Group ("FPG"), brings counts against his former employer and four

of its employees,[1] for (I) violation of the California Information Practices Act, (II) tortious

interference with contractual relations, (IV) negligence, (VII) breach of contract, (VIII) breach of

the implied covenant of good faith and fair dealing, (IX) wrongful termination, and (X) violation

of the Fourteenth Amendment Due Process Clause.[2]  The Court, having considered the motion,

---

[1]Defendants Butler International, Inc. and Glen Trehern were voluntarily dismissed from suit on May 25, 2010.  (Doc. 16).

[2]Plaintiff's response indicates that he has withdrawn Count III, for defamation, and Counts V and VI, for negligent supervision (against former Defendant Butler and Defendant LANL, respectively).

briefs, exhibits, and relevant law, and being otherwise fully informed, finds that Defendants'
motion is well taken and should be granted.


## FACTUAL BACKGROUND

### The parties

At the time the events described in this suit commenced, Plaintiff was a 26-year veteran
of the Los Alamos County Fire Department ("LAFD"), then serving as an Assistant Fire
Chief/Fire Marshal.  Defendant Regents of the University of California, which does business as
Los Alamos National Laboratory ("LANL"), is a foreign non-profit corporation with its principal
place of business in Los Alamos County, New Mexico.  The remaining Defendants were, at all
times relevant to this action, LANL employees: Robert Farris served as a Deputy Group Leader;
William Gorman, as a Technical Facility Operator; and Beverly Ramsey served as a division
leader or office director.  Defendant John Doe is the LANL employee – whose identity is
unknown to Plaintiff – who Plaintiff accuses of releasing personal information about him.

### Plaintiff's offer and conditions of probationary employment

On January 27, 2005, Plaintiff applied for a position with LANL as a Fire Prevention
Specialist, stating his reason for leaving the LAFD as "retirement" on his employment
application.  While it is unclear from the record whether Plaintiff's first application yielded an
offer of employment, on April 17, 2005, he submitted a second application to LANL for another
position at a higher pay grade, also with LANL's FPG.  Plaintiff's second application yielded an
offer of employment as a "Facility Operations Specialist 4" on June 3, 2005.

LANL's offer letter to Plaintiff explained that Plaintiff's continued employment would
be contingent upon his meeting requirements including completion of "a 1 year evaluation

2

period during which your work performance, conduct, and general suitability for Laboratory employment will be evaluated." (Doc. 25 Ex. B).  The letter further indicated that another condition of employment was "[c]ompliance with [LANL's] policies and procedures as set forth in the Administrative Manual and as modified from time to time."  *Id.* (emphasis added). Plaintiff does not dispute that he accepted LANL's employment offer with an understanding of these conditions.

According to the section of LANL's Administrative Manual ("AM") pertaining to the "New Employment Evaluation Period," AM 103, "[e]mployees in new employee evaluation period status may be released at any time at the discretion of the laboratory."  *Id.* Ex. C at AM 103.11 (emphasis added).  "An employee terminated during . . .  the new employee evaluation period may file a formal complaint under AM 111 [the section of the Manual providing guidelines for LANL's complaint resolution process] only if the complaint alleges that impermissible discrimination or retaliation in violation of law of [LANL] policy motivated the termination."  *Id.* at AM 103.12 (emphasis added); *see also* AM 111.08 (providing that cases involving termination "from new employee evaluation period status" are excluded from the complaint resolution process described therein, "except as permitted in . . . AM 103.") (Doc. 25 Ex. D).[3]

---

[3]Defendants claim that LANL's progressive discipline policy, set forth in the Manual at AM 112, similarly excludes employees still within the probationary period.  (Doc. 25 at 4). Defendants do not attach AM 112 to their briefing. Plaintiff disputes the position that probationary employees are not protected by progressive discipline measures, citing what he characterizes as Defendant Ramsey's deposition testimony that a LANL supervisor "used oral counseling on [Plaintiff] as is set forth in [AM] 112" (Doc. 27 at 4).  Because the Court finds that (1) evidence that an employee happened to receive counseling is not evidence that the employee was protected by AM 112 and that (2) Defendants' representations cannot be supported without its submission in the record, the Court does not admit either characterization of AM 112's contents.

Plaintiff testified at his deposition that he understood that he could be released from his position at LANL's discretion at any time during his probationary period.  (Doc. 25 Ex. A, Coburn Dep. at 55:20-55:25).

**Complaints regarding Plaintiff's conduct**

On August 1, 2005, Plaintiff officially began employment with the FPG.  Shortly thereafter, within days of Plaintiff's start date, his supervisor, Jim Streit, began to field a series of complaints about Plaintiff's behavior from three different employees, Glenn Trehern, Defendant Farris, and Defendant Gorman. The complaints began the week of Plaintiff's orientation, and involved, *inter alia*, Plaintiff's purportedly making inappropriate sexual comments about fellow employees and innuendoes about their private lives; making racial and ethnic slurs about other employees; and expressing an unseemly interest in his colleagues' salaries.[4]  Streit had a private meeting with Plaintiff to discuss his co-workers' reports of his behavior, and testified that Plaintiff "was adamant that they were untrue."  (Doc. 25 Ex. F, Streit Dep. at 57:17).  Streit informed Plaintiff that he was going to take the grievances to Human Resources, because "I felt it credible and that I needed to act on it."  *Id.* at 57:21-57:22.

**Plaintiff's termination**

Based on the nature of the complaints against Plaintiff, LANL convened a Rapid Action Team comprised of members of its legal counsel, human relations, staff relations, and management, whose role is to provide guidance in the decision to terminate or discipline an

---

[4]Plaintiff does not dispute that Streit received complaints about his behavior, but challenges Streit's eventual memorialization of those complaints in writing -- apparently prepared in preparation for litigation after Plaintiff's termination and attached to his deposition by Defendant (Doc. 25 Ex. F, Streit Dep. at Ex. 18) – as inadmissible hearsay.    Though the Court finds that Plaintiff was an at-will employee who could be terminated at any time during his probationary period, it does <u>not</u> consider the allegations recited in the Streit deposition.

employee.  After discussions with the Rapid Action Team and Streit, Streit's supervisor, Defendant Ramsey, made the decision to terminate "within the probationary period for the good of the Laboratory."  (Doc. 25 Ex. G, Ramsey Dep. at 49:4-49:5).  Ramsey further testified that her decision was driven by the need to make sure the FPG "was functioning well together."  *Id*. at 71:1-71:4.

Plaintiff was notified of his termination on August 29, 2005.  His termination letter from Ramsey noted that Plaintiff had "conducted [himself] in an unprofessional manner by making inappropriate comments," and that his misconduct had resulted in his termination, "effective immediately pursuant to AM 103."  (Doc. 25 Ex. I).  Shortly thereafter, certain individuals determined that it would be prudent to change the locks to facilities used by Plaintiff, and Defendant Farris contacted Los Alamos County officials to change the locks, without offering any specifics related to Plaintiff's termination.[5]

### *Plaintiff determined excluded from formal complaint resolution process*

On September 27, 2005, Plaintiff filed a Complaint Resolution form under AM 111 contesting his termination.  Plaintiff declared on the form that he was terminated "without any documentation, because I was on new hire probationary status."  (Doc. 25 Ex. J at 2).  Plaintiff summarized his complaint: "Other employees made allegations against me without any investigation/verification by management to validate these verbal allegations.  In addition, management told me based on rumors and other outside comments about my

---

[5]While Plaintiff testified that Jerry Keene of the LAFD told him two years after his termination that Farris had informed Keene that the locks needed to be changed on account of Plaintiff's termination, Plaintiff does not deny that he had no direct knowledge of the conversation and has stipulated that Farris did not provide any details during the phone call. (Doc. 27 at 7, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts Nos. 24-25).

personal/employment history that the allegations must be true." *Id.*

On October 3, 2005, Plaintiff was notified by LANL's Human Resources Division, Complaint Resolution Services that his grievance would not be accepted in light of the fact that "AM 111.08 specifically excludes from review terminations of employees during their new employee evaluation period." (Doc. 25 Ex. L). The determination memorandum further informed Plaintiff that he could appeal the decision under AM 111.13 within 10 calendar days of his receipt of the memorandum. Plaintiff did not appeal the decision.

### *LANL's production of documents related to Plaintiff's termination*

On February 14, 2008, two-and-a-half years after Plaintiff's termination, LANL was subpoenaed by counsel for Plaintiff's former wife, Martha Perkins, to produce "any and all documents . . . regarding the hiring and termination of [Plaintiff]," in an unrelated litigation. (Doc. 25 Ex. K). A copy of the subpoena was issued to Plaintiff. LANL produced documents in response to the subpoena.

On July 11, 2008, while testifying in the litigation involving his former wife, Plaintiff acknowledged that he was released from employment while still on probationary status.

### PROCEDURAL HISTORY

On August 3, 2007, Plaintiff filed a state law action in the First Judicial District, County of Santa Fe. (Doc. 1 Ex. A). The Complaint was never served on any of the Defendants. (Doc.1 at 2).

Twenty-two months later, on June 19, 2009, Plaintiff filed his *First Amended Complaint for Violation of the California Information Practices Act, Tortious Interference with Contractual Relations, Defamation, Negligence, Negligent Supervision, Breach of Contract, Breach of the*

*Implied Covenant of Good Faith and Fair Dealing, Wrongful Discharge, and Deprivation of*

*Civil Rights.*  (Doc. 1 Ex. B).  On July 24, 2009, Defendants removed the action to the U.S.

District Court for the District of New Mexico, where it was subsequently assigned to the

undersigned and U.S. Magistrate Judge Alan C. Torgerson.  (Doc. 1).

On October 27, 2010, Defendants filed the instant motion.  (Doc. 24).  Briefing was

complete on December 20, 2010.  (Doc. 29).

## LEGAL STANDARD

### Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be

rendered "where no genuine issue of material fact exists, and the moving party is entitled to

judgment as a matter of law."  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th

Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of

"show[ing] that there is an absence of evidence to support the nonmoving party's case."

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation

and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party

to show that there is a genuine issue of material fact.  The party opposing the motion must

present sufficient evidence in specific, factual form for a jury to return a verdict in that party's

favor."  *Id.  See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the

nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New*

*Mexico Taxation and Rev. Dept.*, No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M.,

Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions,

7

allegations unsupported by specific facts, or speculation") (internal quotation and marks

omitted). In reviewing a motion for summary judgment, the court must "examine the factual

record and draw reasonable inferences therefrom in the light most favorable to the nonmoving

party." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir.

2010).  Its function at this stage is "not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 243.


## DISCUSSION

### I.  Plaintiff's Contractual Claims

Plaintiff's state law claims for Breach of Contract (Count VII), Tortious Interference with

Contractual Relations (Count II), Breach of the Implied Covenant of Good Faith and Fair

Dealing (Count VIII), and Wrongful Termination (Count IX) rely on the existence of an implied

contract between Plaintiff and LANL.  As a threshold matter, the Court notes that in *Mascheroni*

*v. Board of Regents of the University of California, et al.*, 28 F.3d 1554, 1557-1560 (10th Cir.

1994), the Tenth Circuit held that Eleventh Amendment sovereign immunity barred the state law

claims of a former LANL employee – including a claim for breach of contract -- against the

Board of Regents of the University of California, as the operator of LANL.  The issue of whether

*Mascheroni* applies to the instant case has not been raised or briefed by the parties. However, the

Court finds that even if it does possess jurisdiction over Plaintiff's state law claims, Defendants

are plainly entitled to summary judgment on each of those claims on the merits.

### A.  Breach of Contract (Against LANL)

Plaintiff's breach of contract claim is premised on the position that LANL's

Administrative Manual created an implied contract between them, pursuant to which his

8

employment with the FPG "was governed by the terms and provisions of the Administrative Manual."  (Doc. 1 Ex. B, Cplt. ¶ 94).  Specifically, Plaintiff contends that LANL breached two sections of the Manual: (1) AM 112,  which governed accusations of employee misconduct, and contained, in Plaintiff's words, an implied promise "that accusations against employees will be investigated in a reasonable fashion before the employee is terminated for cause," (*id.* ¶ 95); and (2) AM 111, which outlined the process by which an employee may appeal  a termination decision.  Plaintiff claims that "LANL did not follow the processes outlined in AM 111 and [that Plaintiff] was denied the opportunity to pursue appeals under AM 111 by LANL."  *Id*. ¶96.

As an initial matter, Plaintiff is correct that, in certain circumstances, "[a] personnel manual results in an implied contract if it controls the employer-employee relationship and an employee can reasonably expect his or her employer to conform to the manual's procedures." *N.M. Regulation & Licensing Dept. v. Lujan*, 127 N.M. 233, 238 (1999).  Here, however, Plaintiff has not disputed that the section of the Manual specifically pertaining to employees that, like Plaintiff, were still in the one-year probationary period, AM 103, states that a probationary employee may be terminated at will: "Employees in new employee evaluation period status may be released at any time at the discretion of the laboratory."  (Doc. 25 Ex. C at AM 103.11). Plaintiff does not point to any provision in either AM 112 or AM 111 that limits LANL's discretionary authority to terminate a probationary employee at will under AM 103.  Plaintiff does not deny that he was under probation at the time of his firing, or that he signed an offer letter confirming that his continued employment at LANL would be contingent on his successful completion of the probationary period, during which his "conduct," "general suitability for Laboratory employment," and "ability to work in a team environment" would be subjected to his supervisors' scrutiny.  (Doc. 25 Ex. B).  Plaintiff further testified to his unqualified

understanding that he could be released from his position at LANL's discretion at any time during his probationary period.  (Doc. 25 Ex. A, Coburn Dep. at 55:20-55:25).

In the undisputed absence[6] of any provision in AM 112 explicitly limiting LANL's authority to terminate probationary employees "at any time" under AM 103, Plaintiff claims that LANL's authority is limited by the understanding of the employees empowered to make the decision to terminate.  He points to the deposition testimony of Defendant Ramsey, "the ultimate decision-maker as to whether or not Plaintiff was to be terminated," (Doc. 27 at 9), which Plaintiff says "clarifies that the discretion to terminate a probationary employee was not absolute" and "require[d] that certain steps and processes be followed."  *Id.* at 10.  Ramsey testified that LANL did not provide "a formal guidance manual" to supervisors setting forth guidelines that must be followed before firing a new employee within the period of probation, but that, after "verbal training," she understood the exercise of her discretion to terminate such employees thusly: "If we believed, and I am talking about the manager that was the direct manager for a person . . . that person was not working out . . . [and] if I agreed with that manager that those were problems sufficient not to continue the employment relationship, then I would certainly go with the recommendation that the group manager brought."  (Doc. 27 Ex.B, Ramsey Dep. at 26:19-27:7).  Ramsey further testified that Plaintiff's Group Leader, Jim Streit, recommended his termination; that her Assistant Director, Scott Gibbs, needed to sign off on the termination, which he did; and that, in her experience, LANL put together "Rapid Response Teams for every termination that I have been part of," comprised of "a clear bunch of heads" who could collectively offer a recommendation for or against the employee's firing, (*id.* at

---

[6]As noted above, AM 112 was not entered into the record by either party.

41:12-41:24), and that the Team recommended termination in Plaintiff's case.

According to Plaintiff, there is a genuine dispute of material fact as to whether Ramsey followed what he styles, in light of her testimony, the mandatory "first step" of obtaining the recommendation of his Group Leader, Mr. Streit, before firing him.  He points to Streit's testimony that Streit took the complaints against Plaintiff to Ramsey but did "not recall making a specific recommendation" that Plaintiff be terminated and didn't "recall an emphatic decision or discussion on termination either." (Doc. 27 Ex. E, Streit Dep. at 65:13-65:14; 67:24-67:25). Plaintiff somewhat disingenuously summarizes this testimony as evidence that "Streit was adamant that he had never made that recommendation," which Plaintiff notes "makes sense" in light of his and Streit's long-standing friendship and the fact that Streit suggested he apply for the position in the first place.  (Doc. 27 at 10-11).[7]

Even taking into account Ramsey's and Streit's testimony, the Court finds that Plaintiff has not shown a dispute that LANL breached a contractual obligation to extend the progressive discipline protections of AM 112 to him.  As noted above, Plaintiff has testified that he understood that he could be released from his position at LANL's discretion at any time during his one-year probationary period, an employment relationship that closely resembled that of an at-will employee for the period in question.  *See Melnick v. State Farm Mut. Auto Ins. Co.*, 106 N.M. 726, 730 (1988).  Neither Plaintiff's offer letter nor the Administrative Manual specifically

---

[7]In addition, Plaintiff points to Defendant Farris's testimony that he was present for the Rapid Action Team meeting as evidence that LANL failed to follow accepted procedure in obtaining an objective recommendation from the Team as to whether he should be terminated, given the fact that Farris was one of the colleagues who complained of Plaintiff's conduct. (Doc. 27 at 12).  However, Farris further testified that he "was pretty much just left aside because I was a witness only" to the meeting, making it clear that he did not participate in any recommendation to terminate Plaintiff.  (Doc. 27 Ex. C, Streit Dep. at 55:18-55:22).

stated that Plaintiff, as a probationary employee, would be entitled to receive progressive discipline before he was terminated – a guarantee that would void LANL's personnel rule that "[e]mployees in new employment evaluation period status may be released at any time at the discretion of the laboratory."  (Doc. 25 Ex. C at AM 103.11).  While an employer's representation in an employee handbook like LANL's Administrative Manual may give rise to a contractual right, *see Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 668 (1983), to reach the level of creating a contractual right, the terms of the employer's representation must be sufficiently explicit to create a reasonable expectation of an implied contract.  *See Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 131 N.M. 607, 616 (2001); *Garrity v. Overland Sheepskin Co.*, 121 N.M. 710, 713 (1996).  Here, Plaintiff points to no legal authority showing that a supervisor's personal understanding of the typical procedures involved before terminating a probationary employee – an understanding never memorialized or otherwise disclosed to the employee – is sufficient to create a reasonable expectation in the employee of an implied contract allowing for progressive disciplinary procedures.  Thus, the Court finds that Ramsey's testimony as to the typical process by which she terminated probationary employees is insufficient to modify the plain language of AM 103 and Plaintiff's offer letter – representations on which Plaintiff presumably relied in accepting his position.

Moreover, even if Plaintiff *could* demonstrate that the unwritten pre-termination process generally described by Ramsey limited LANL's authority to terminate him at will, Plaintiff offers no evidence of a genuine dispute as to whether that process was properly followed. Nowhere in the portions of her deposition made available to the Court did Ramsay testify that she required Streit's recommendation in order to terminate Plaintiff, only that "the typical process" with respect to such terminations would be for the Group Leader (Streit) to raise the

12

issue of the employee's performance with the Division Leader (Ramsey) by recommending termination, as it was Streit, as Plaintiff's direct supervisor, who was situated to present her with evidence that Plaintiff's conduct was causing problems in the workplace.  (Doc. 27 Ex.B, Ramsey Dep. at 26:19-27:7, 28:2-28:8).  While Ramsey testified that Plaintiff's case was in fact a typical one in which the Group Leader recommended termination, and Streit testified that he could not specifically recall making the recommendation, Plaintiff does not dispute that Streit presented the various complaints against Plaintiff to Ramsey, and that she reviewed them with a Rapid Action Team before making the decision to terminate him.  (Doc. 27 at 6, Plaintiff's Response to Defendants' Undisputed Material Facts Nos. 18-20).  In the absence of any evidence that his direct supervisor's endorsement was required to effect Plaintiff's termination during the probationary period, there is simply no dispute that LANL was within its rights in releasing him at Ramsey's discretion during his first year of employment.  *See* Doc. 25 Ex. C at AM 103.11.

Plaintiff's response brief makes no mention of the other section of the Administrative Manual that his Complaint alleges was breached, AM 111, "Complaint Resolution."  Indeed, AM 111 specifically excludes from coverage those employees terminated during the new employee evaluation period, except as permitted by AM 103 – which holds that a terminated probationary employee "may file a formal complaint under AM 111 only if the complaint alleges that impermissible discrimination or retaliation in violation of law of [LANL] policy motivated the termination." *See* Doc. 25 Ex. D at AM 111.08; Doc. 25 Ex. C at AM 103.12.  Here, Plaintiff filed a complaint under AM 111 that did not contain the hint of an allegation of impermissible discrimination or retaliation; rather, Plaintiff alleged that he was fired "without any documentation" and "without any investigation" by management into whether the complaints about his behavior were true.  (Doc. 10 Ex. J at 2).  Not surprisingly, LANL then cited AM 111

13

in determining that Plaintiff was ineligible to participate in its formal complaint resolution process, though it informed him that he could appeal its eligibility determination pursuant to AM 111.13.  (Doc. 25 Ex. K).  Plaintiff does not deny that he failed to take the appeal.  Moreover, Plaintiff offers no argument as to how the allegations set forth in his internal grievance constituted a charge of discrimination or retaliation or how LANL's determination was otherwise in error.

Because Plaintiff has failed to set forth a claim from which a reasonable trier of fact could conclude that LANL breached an employment contract with him, the Court finds that LANL is entitled to summary judgment on his breach-of-contract claim.

**B.  Tortious Interference With Contractual Relations** (Against Farris and Gorman)

Plaintiff alleges that Defendants Farris and Gorman tortiously interfered with his contract with LANL by falsely accusing him of making inappropriate comments, which caused LANL to terminate his employment.  "To properly plead a claim of tortious interference with existing contractual relationships, a plaintiff must allege that: (i) the defendant had knowledge of existing contracts; (ii) the contracts were breached; (iii) the defendant played an active and substantial part in causing the plaintiff to lose the benefits of the contract; (iv) damages flowed from the breached contract; and (v) the defendant induced the breach without justification or privilege."  *Horizon AG-Products v. Precision Sys. Engineering, Inc.*, 2010 U.S. Dist. LEXIS 107984, at *17 (D.N.M., Sept. 28, 2010).  Because Plaintiff has failed to state a claim for breach of contract under prong two, it follows that he cannot properly plead a claim for tortious interference against Farris and Gorman.

**C.  Breach of the Implied Covenant of Good Faith and Fair Dealing** (Against LANL)

"New Mexico courts have recognized a cause of action for breach of the covenant of

14

good faith and fair dealing sounding in contract." *Eoff v. N.M. Corr. Dep't*, 2010 U.S. Dist.
137159, at *27 (D.N.M., Dec. 20, 2010) (citations omitted).  "The implied covenant is aimed at
making effective the agreement's promises; thus, it is breached only when a party seeks to
prevent the contract's performance or to withhold its benefits from the other party." *Id*. at *28
(quotation and brackets omitted).  Plaintiff's Complaint declares that LANL, "in failing to
investigate adequately the allegations of misconduct that had been leveled against [Plaintiff], in
terminating him for cause without an opportunity to clear his name, and in failing to comply with
the disciplinary and appeal process of the Administrative Manual, including AM 112, . . .
breached the implied covenant of good faith." (Doc. 1 Ex. B, Cplt. ¶ 104).  Plaintiff's brief,
however, does not mention the claim or offer any facts specifically supporting this cause of
action.

          As discussed above, Plaintiff has pointed to no provision in the Administrative Manual
that modified the terms of his employment as he understood it from his offer letter and the
relevant section of the Manual, AM 103, both of which specifically state that new employees in
their first year of employment may be released at any time at LANL's discretion.  While the gist
of Plaintiff's statements in his Complaint appears to be that LANL breached an implied covenant
by stating a cause for his termination without allowing him the opportunity to "clear his name,"
Plaintiff does not offer a single argument supporting the position that LANL limited its
discretion to terminate him by stating a reason for its decision.  While Ramsey's testimony as to
LANL's typical termination process suggests that LANL's practice is not to fire probationary
employees at will simply because it can, without first discussing the reasons for and
appropriateness of the termination, courts interpreting New Mexico contract law "will not
consider evidence that a company does not usually fire employees without a good reason as *by*

*itself* establishing that the company does not maintain an at-will employment policy.  To do otherwise would encourage employers to occasionally fire employees for no other reason than to show that they maintain the freedom to do so." *Hartbarger*, 115 N.M. at 674.  Moreover, Plaintiff does not deny that LANL empowered him to take an appeal from its decision that the complaint resolution process set forth in the Manual did not, on its face, apply to a probationary employee unless the employee made allegations of discrimination or retaliation on the part of the employer, and that he failed to take the available appeal.

Thus, because Plaintiff has failed to state a cause of action for breach of the implied covenant of good faith and fair dealing, LANL is entitled to summary judgment on this additional ground.

**D.  Wrongful Termination** (Against LANL)

With respect to his count for wrongful termination, Plaintiff's brief fails to set forth the elements of a wrongful termination claim and sets forth no argument in support of the claim, either.  This leaves the Court with only his declaration in the Complaint that "[i]n terminating [Plaintiff's] employment for cause, LANL was bound to follow procedures set forth in the AM 111, AM 112, and the Administrative Manual generally.  LANL failed to follow those procedures, and that failure constituted a breach of the employment contract."  (Doc.1 Ex. B, Cplt. ¶ 109).  Plaintiff's wrongful termination claim thus appears to be based on exactly the same facts and legal arguments as his breach-of-contract claim and must fail for the same reasons. *See discussion, supra,* at 8-14.

**II.     Plaintiff's Constitutional Due Process Claim** (Against LANL and Ramsay)

Plaintiff's response brief acknowledges his due process claim "is intimately related to

16

Plaintiff's contract claims.  Plaintiff concedes that if this Court determines that he has no contractual right that neither does he have a property right under the Constitution." (Doc. 27 at 13).  In light of the Court's findings that Defendants are entitled to summary judgment on each of Plaintiff's contractual claims, the Court finds that Defendants are entitled to summary judgment on his constitutional due process claim as well.

**III.    Negligence** (Against LANL and Ramsay)

Plaintiff argues that both LANL and Ramsay – as the individual who ultimately terminated him – owed him a duty of reasonable care in investigating the accusations against him before making the decision to terminate his employment.  According to Plaintiff, the duties that were owed him in these circumstances were to follow what he characterizes as "certain [required] procedures in implementing [AM] 103," (Doc. 27 at 15), i.e., the "typical process" that Ramsay testified she would undertake before firing an employee.  (Doc. 27 Ex. B, Ramsey Dep. at 26:19-27:7, 28:2-28:8).  Specifically, Plaintiff again points to what he argues is a genuine dispute of fact arising from the testimony of Ramsey and Streit over whether the latter recommended Plaintiff's termination, which he testified he could not recall doing.  Hence, Plaintiff maintains that the "same facts that render the contract-type claims disputed serve to dispute the negligence claims." (Doc. 27 at 15).

As discussed above with regard to Plaintiff's breach-of-contract claim, the Court finds that Defendants were under no obligation, pursuant to any provision of AM 103 or any other disputed section of the Administrative Manual, to apply progressive discipline measures or any other pre-termination procedures before firing Plaintiff during the first year of his employment. *See supra* at 8-9.  Further, the Court finds that even if Plaintiff could show, based on Ramsay's

17

testimony, that an unwritten pre-termination process limited Defendants' authority to terminate him, Ramsay in fact never testified that she required the recommendation of a probationary employee's direct supervisor in order to terminate him.  *See supra* at 11-14.  Rather, Ramsay's testimony was that a typical case involved the probationary employee's group manager – as his direct supervisor -- alerting her to the fact that a the employee was not working out by coming to her with a recommendation of termination, and "if I agreed with that manager that those were problems sufficient not to continue the employment relationship, then I would certainly go with the recommendation that the group manager brought."  (Doc. 27 Ex. B, Ramsey Dep. at 27:3-27:7).  Ramsey confirmed, in response to Plaintiff's counsel's question, that this was "the typical process" by which she would become involved with a probationary employee's termination – not that LANL had any policy (let alone one which its probationary employees were aware of or relied on) that a probationary employee could not be terminated without the approval of his most direct supervisor.  *Id.* at 28:2-28:8.

Thus, for the same reasons underlying Plaintiff's breach-of-contract claim, the Court finds that Defendants are entitled to summary judgment on Plaintiff's negligence claim.

**IV.     California Information Practices Act** (California Civil Code §§ 1798 et seq.)
         **(Against LANL, Doe, Ramsay, and Farris)**

Finally, Plaintiff alleges that Defendants violated the California Information Practices Act, California Civil Code §§ 1798 et seq. ("CIPA"), by disclosing personal information about him, "including . . . his name, physical description, and employment history," to "other LANL employees, the Los Alamos Police Department, the Los Alamos Fire Department, and other

persons such as Richard Lees[8]" without his permission, causing him damage including mental suffering.  (Doc. 1 Ex. B, Cplt. ¶¶ 62-63).  In the two paragraphs devoted to the CIPA count in his response brief, however, Plaintiff fails to identify any improper disclosures made by Defendants beyond responding to Defendants' argument that LANL acted properly in producing documents relating to his employment in the litigation between Plaintiff and his former wife, Martha Perkins.  Because Plaintiff fails to argue why Defendants should be denied summary judgment on any portion of the instant claim except with respect to LANL's document production in the Perkins litigation, the Court will not comb through the Complaint in an attempt to locate and analyze other possible factual bases in support of the claim.

CIPA § 1798.24(k) provides that "[n]o agency may disclose any personal information in a manner that would link the information disclosed to the individual to whom it pertains unless the information is disclosed . . . To any person pursuant to a subpoena, . . . if, before the disclosure, the agency reasonably attempts to notify the individual to whom the record pertains, and if the notification is not prohibited by law" (emphasis added).  The record shows that on February 12, 2008, Perkins' lawyer, Richard Lees, issued a subpoena to LANL seeking "any and all documents . . . regarding the hiring and termination" of Plaintiff, in anticipation of a hearing to determine child support and the dissolution of property between the former spouses.  (Doc. 25 Ex. L).  The attached Certificate of Service bears Lees' signed attestation that he served a copy of the subpoena on Plaintiff at his home address by first-class mail.  *Id.*  Defendants contend that in producing the requested documents, LANL operated with the understanding that reasonable

---

[8]Mr. Lees has been identified by Defendants as the Santa Fe attorney who represented Plaintiff's ex-wife in an unrelated civil action and served a subpoena on LANL requesting production of all documents regarding Plaintiff's hiring and termination from the FPG.  *See supra* at 6; *see also* Doc. 25 Ex. L.

attempts had been made to notify Plaintiff of the document request.  In addition, Defendants maintain that even if Defendant could show that LANL failed to comply with the relevant subsection, an individual may only bring a civil action against an agency for failure to comply with CIPLA "in such a way as to have an adverse effect on an individual," CIPA § 1798.45(c), and that Plaintiff cannot show how he was adversely effected by any omission on LANL's part.

Plaintiff's response argues there are three bases for denying summary judgment.  First, Plaintiff contends that LANL violated CIPA by never informing him about the subpoena, and that he and his attorney in the Perkins case in fact remained unaware of the subpoena until his custody hearing – though he admits that he received a Certificate of Service from Lees stating "that he was *going* to subpoena LANL" (Doc. 32 Ex. 1, Coburn Aff. ¶ 8) (emphasis added). Second, Plaintiff suggests that LANL produced a document to Lees "that might not have been subject to disclosure even if the disclosure was valid or justified."  (Doc. 27 at 16).  He points to a brief excerpt of the deposition testimony of Patrick Trujillo – apparently a LANL employee, though his position at LANL and relationship to Plaintiff are not set forth in the record – who, when asked about a report summarizing complaints about Plaintiff made by his co-workers, testified that a hard copy of such a report would not typically be included in an employee's personnel file (Plaintiff thus implies that the report shown to Trujillo at his deposition was one of the documents produced by LANL in the Perkins litigation).  (Doc. 32 Ex. 8, Trujillo Dep. at 11:20-11:22). Third, and relatedly, Plaintiff maintains that he was adversely effected by LANL's "improper release of [ ] protected information," i.e., the substance of his co-workers' allegations against him, because his child visitation rights were greatly reduced by the court in the Perkins case and "he has spent almost $60,000 in fighting custody issue" since the unflattering disclosures.  (Doc. 27 at 16).

20

Plaintiff's admission that he received a Certificate of Service from Lees undermines his claim that he has suffered an adverse effect as a result of any actual violation of CIPA. To be sure, it appears that LANL failed to comply with § 1798.24(k) of the statute, which requires that an agency producing information about an individual pursuant to a subpoena make "reasonabl[e] attempts to notify the individual to whom the record pertains" that the information has been sought pursuant to a subpoena. *Id.* But having been given actual advance notice by Lees, Plaintiff was free to challenge the subpoena, which he apparently did not do.

The Court need not consider LANL's failure to reasonably attempt to notify Plaintiff about (1) issuance of the subpoena or (2) LANL's production of documents in response to it, in light of Plaintiff's failure to show that he suffered an adverse effect as a result of either omission. With respect to his claim that he was not made aware of the subpoena at the time its was issued, Plaintiff does not deny that he received advance notice in the form of a Certificate of Service from Lees declaring that Lees "was going to subpoena LANL, [though] neither my lawyer nor I were aware of the subpoena [itself] until the hearing" in Plaintiff's ongoing custody dispute. (Doc. 32 Ex. 1, Coburn Aff. ¶ 8). Plaintiff offers no further support or explanation for this allegation, and does not allege that he ever informed the court in the Perkins case that he did not receive a copy of the subpoena.

The Court need not reach the issue of whether Lees' signed attestation is sufficient evidence that Plaintiff was aware that a subpoena seeking information related to his termination was issued to LANL. Plaintiff does not claim to have suffered any of the adverse effects required by CIPA § 1798.45(c) because he was ignorant of the subpoena, by alleging that the subpoena required disclosure of protected material, so that he was prejudiced by being denied the opportunity to move to quash or modify it before LANL responded to it. Indeed, Plaintiff

21

merely states in his affidavit that he learned of the subpoena for the first time at his custody hearing but does not describe any prejudice arising from his late notice of the subpoena.

Rather, Plaintiff's claim rests on his argument that LANL violated CIPA by producing information that he variously describes as "private information contained in [my] personnel file," (Doc. 27 at 16), and "false information about me related to my employment, alleged reasons for my termination and statements regarding allegations that I was a violent person," the production of which Plaintiff "strongly believe[s] . . . was the reason that the court entered the order denying me visitation" in his custody dispute. (Doc. 32 Ex. 1, Coburn Aff. ¶ 5). With respect to the former allegation, Plaintiff does not identify the documents whose disclosure he disputes, explain what about their contents should have protected them from disclosure, or demonstrate how the fact that the documents disclosed information of an embarrassing nature made that information less responsive to a subpoena that sought "any and all documents . . . regarding [Plaintiff's] hiring and termination." (Doc. 25 Ex. L). In lieu of such arguments, Plaintiff asks the Court to find the testimony of a LANL employee that an unidentified report summarizing complaints about Plaintiff's conduct would not normally be found in his personnel file to be evidence that the report should not have been produced. Plaintiff does not explain how the report's location – inside or outside of Plaintiff's personnel file – made it any less responsive to Lees' subpoena.

As to Plaintiff's allegation that LANL violated CIPA by disclosing false information about him, Plaintiff does not allege that LANL knowingly disseminated false information or that it held out his co-workers' allegations as true by producing documents that recited them. Whether or not Plaintiff's co-workers' complaints were true, they were set forth in documents directly related to LANL's decision to terminate Plaintiff, and LANL –as an at-will employer for

22

the first year of Plaintiff's employment – was under no obligation to establish their truth prior to terminating him.

Because Plaintiff has not shown that he suffered any adverse effects required by CIPA, LANL is entitled to summary judgment on this count as well.

## CONCLUSION

For the foregoing reasons, it is therefore ordered that Defendants' *Motion for Summary Judgment* (Doc. 24) is GRANTED.


_____
**UNITED STATES DISTRICT JUDGE**

23